LYNCHBURG GAS COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Atlantic Seaboard Corporation,
Intervenor.

No. 12953.

United States Court of Appeals
Third Circuit.

Argued Nov. 6, 1959.

Decided Feb. 24, 1960.

Phebe Eppes Gordon, Lynchburg, Va. (Norris, Lex, Hart & Ross, Philadelphia, Pa., on the brief), for petitioner.

Robert L. Russell, Washington, D. C. (Willard W. Gatchell, General Counsel, Howard E. Wahrenbrock, Sol., David J.

Bardin, Attorney, Federal Power Commission, Washington, D. C., on the brief), for respondent.

Brooks E. Smith, New York City (Daniel L. Bell, Jr., New York City, and R. K. Talbott, Charleston, W. Va., on the brief), for intervenor.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Petitioner, Lynchburg Gas Company (Lynchburg) seeks review of an order of the Federal Power Commission (Commission) which denied Lynchburg's request for a supplemental gas supply from Transcontinental Gas Pipe Line Corporation (Transco). Atlantic Seaboard Corporation (Seaboard), which presently supplies all of Lynchburg's gas, intervened to resist the application.

Lynchburg's proposal contemplated the creation of a subsidiary, Lynchburg Pipe Line Company (Pipeline), which would purchase gas from Transco and supply it to Mead Corporation (Mead) a large industrial user of coal but who, according to Lynchburg, will convert its boilers to gas upon a sufficient supply being made available. A limitation in Seaboard's tariff restricts the amount of gas available for resale as boiler fuel to 2,000 Mcf per day. Mead's requirement allegedly would be 6,500 Mcf per day. This industrial sale is expected to help make construction of a connecting line from Transco to Pipeline feasible. Lynchburg claims "the overall plan would provide an economical and necessary additional gas supply for the people of Lynchburg by making available to petitioner, during the periods of peak demand, the volumes of gas required in excess of the quantities presently available from Seaboard * * *". At the hearing, Lynchburg was unable to show any firm commitment from Mead to convert to and buy gas from the petitioner.

The Commission's refusal to issue a certificate is based upon three grounds:

(1) Lynchburg's failure to present a market for the gas to be received from Transco in that it had no evidence of a firm commitment from Mead Company, the source it relied on.

(2) The end use of the gas to be supplied is inferior in that it is to be employed in the firing of boilers for commercial production rather than in the heating of homes.

(3) It is protecting the pioneer certificated supplier in the area, Seaboard, from economic injury.

We find the refusal of the Commission can be sustained on the first ground only. Lynchburg argues that being an old-established, reputable firm the Commission should presume it would not proceed with its project unless and until it was sure it could attach customers to the proposed facility. In its reply brief the petitioner agrees that the Commission can issue a certificate with a condition, urging that in this instance it could have insisted on a firm commitment with a time limitation. Section 717f(e), 15 U.S.C.A. conveys power to impose conditions within the discretion of the Commission. Oklahoma Natural Gas Co. v. Federal Power Commission, 1958, 103 U.S.App.D.C. 256, 257 F.2d 634 certiorari dismissed, 1959, 358 U.S. 948, 79 S.Ct. 603, 3 L.Ed.2d 567. Having power to condition a certificate, it is not unreasonable that the Commission have power to withhold a certificate until the condition is met. This is particularly so where, as here, the demand is not overly burdensome. There is no insistence by the Commission of commitments from a multitude of potential customers but simply from the one industrial user relied on by the petitioner.

If and when Lynchburg obtains authorization from Mead it can immediately begin a new action before the Commission. No long delay should be thus involved since that would be a minor proposition standing alone as compared to the fact that the present proceeding is part of a large litigation before the Commission.

The Commission's second objection to the issuance of the certificate,

that of the end use of the gas to be supplied Lynchburg has been laid to rest by the decision of this court in a companion case to the one here, Consolidated Edison Company, v. F. P. C., 3 Cir. 1959, 271 F.2d 942. In view of that decision there is little if any merit in the Commission's argument that "an additional burden is cast upon Lynchburg by virtue of the fact that its request * * * was essentially for boiler-fuel gas."

■ The third reason for the refusal to issue the certificate is to protect the pioneer certificated supplier, Seaboard, from economic injury because of loss of base load sales in the Lynchburg market area. Seaboard urges, and the Commission held, that excesses, caused by curtailment of Mead's supply by Pipeline, either completely or partially on certain days during the year, and excesses due to Mead not using the amount expected by Lynchburg, will be sold by Pipeline to Lynchburg for use in the Lynchburg area thereby displacing Seaboard's sales.

Seaboard's policy witness, Mr. Workman, gave estimated monetary losses of Seaboard based on load factor percentages which had Mead using less than the 6,500 Mcf per day which Lynchburg claims it will use. According to the witness this would necessitate Pipeline either cutting back on its purchases from Transco or selling the remaining gas to Lynchburg. His estimation of Seaboard's loss was based on an assumption of Mead using gas at a 65% load factor and again at an 80% load factor and further assuming that Pipeline sold the remaining 35% or 20% to Lynchburg thereby displacing that amount from Seaboard. Quite apparently that testimony, and the exhibits introduced in connection with it, are simply assertions of possibilities and do not support Seaboard's stand. This is further pointed up by the witness's admission that he was completely unfamiliar with the Mead Company and its operations.

All of the above is important in revealing the weakness of Seaboard's stated position. However, the below quoted testimony from Mr. Workman goes further and suggests that Seaboard's major opposition emanates from the fact that due to the absence of a contractual understanding between Lynchburg and Mead, Seaboard has no actual knowledge of what will develop should Lynchburg be awarded the desired gas:

"Q. Mr. Workman, would you summarize the factual or economic reasons why Atlantic Seaboard Corporation is convinced that the attempt of Lynchburg Pipe Line Company to secure gas from Transcontinental for resale to Lynchburg Gas Company will adversely affect Atlantic Seaboard Corporation. A. It is our belief that Atlantic Seaboard Corporation could have a substantial portion of its present and future market taken away from it by Lynchburg Pipe Line Company, and indirectly by Transcontinental. *This is based upon the fact that there is no contractual commitment on the part of Mead Corporation* to buy any or a fraction of the proposed 6,500 Mcf per day, which Lynchburg Pipe Line Company is seeking from Transcontinental. In the event that the Mead Corporation should enter into some sort of a contract with Lynchburg Pipe Line Company, any of the major elements of that contract which would indicate a daily quantity below 6,500 Mcf, a contract term less than 20 years, a minimum bill less than that required for an extremely high load factor, and the likes, would be a direct threat that Lynchburg Pipe Line Company would have to sell to its affiliate, Lynchburg Gas Company, in order to protect the financial integrity of the two companies.

"The necessary effect would be that Atlantic Seaboard Corporation would be substantially hurt by the loss of any portion of its market." (Emphasis supplied.)

This emphasizes once more that most of Lynchburg's difficulty stems from its failure to have some substantial arrange-

ment with Mead. Presumably Lynchburg will initiate new proceedings if it is successful in procuring such agreement. The latter, if secured, should eliminate or at least greatly reduce speculation regarding injury to Seaboard. As of now any alleged injury is ephemeral.

The Commission's order will be affirmed solely because of the failure of Lynchburg to produce evidence of any binding arrangement with its named purchaser of the natural gas supply it seeks.